## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| CINDY HALABURDA, individually, and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>BAUER PUBLISHING CO., LP, a Delaware partnership,<br><br>                    Defendant. | Case No. 1:12-cv-12831-TLL-CEB<br><br>**AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br><br>[Hon. Thomas L. Ludington] |

## <u>AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff Cindy Halaburda ("Plaintiff" or "Halaburda") brings this Amended Class Action Complaint ("Complaint") against Defendant Bauer Publishing Co., LP ("BPC") to obtain redress for all persons injured by BPC's intentional and unlawful disclosure of Plaintiff's and its other subscribers' highly personal and sensitive information. For her Complaint, Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

### NATURE OF THE CASE

1.      BPC is part of a German international media, news, and entertainment company that publishes some of the most widely circulated magazines in the United States, including *In Touch Weekly*, *Life & Style Weekly*, and *Woman's World*.

2.      Unfortunately for its subscribers, BPC isn't content with just making money from magazine sales. Instead, BPC double dips by selling off its subscribers' personal information—including, *inter alia*, their full names, titles of magazines subscribed to, and home addresses (collectively "Personal Reading Information"), as well as myriad other personal and lifestyle

information such as their e-mail addresses, gender, age, and, when applicable, the number, age, and gender of children living in the household—to data miners and other third parties.

3.      BPC's disclosure of such personal, demographic, and lifestyle information is not only unlawful, but also dangerous. For example, BPC will sell—to anyone willing to pay for it— a list with the names and addresses of all *Woman's World* subscribers in Saginaw who have two or more daughters under age thirteen.

4.      While BPC profits handsomely from such practices, its subscribers remain completely unaware that their personal information is being sold on the open market. In fact, BPC never notifies its customers—much less receives their consent—prior to selling their Personal Reading Information.

5.      By selling its customers' Personal Reading Information without their consent, BPC not only ignores its customers' basic privacy rights, but also violates Michigan's Video Rental Privacy Act, M.C.L. § 445.1712 ("VRPA"), which prohibits companies from disclosing without permission any record or information identifying a customer as having purchased specific written materials.

6.      Accordingly, Plaintiff Halaburda brings this Amended Class Action Complaint against BPC for its intentional and unlawful disclosure of her Personal Reading Information in violation of the VRPA and for breach of contract.

## PARTIES

7.      Plaintiff Cindy Halaburda is a natural person and citizen of the State of Michigan.

8.      Defendant Bauer Publishing Co., LP is a Delaware partnership with its headquarters and principal place of business at 270 Sylvan Avenue, Englewood Cliffs, New Jersey. BPC has thousands of Michigan subscribers, and does business throughout Michigan and

the United States.

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over BPC because BPC does business in

Michigan—including soliciting consumer business from, and entering into consumer transactions

with, Michigan consumers—and its unlawful conduct alleged in the Complaint occurred in, was

directed at and/or emanated from Michigan.

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(d), because at least one Class member is a citizen of a different state than Defendant, the

amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and none of the

exceptions under that subsection apply to this action.

11.      Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part

of the events and omissions giving rise to the claim occurred in this District. 28 U.S.C.

§ 1391(a)(2). Venue is additionally proper because Plaintiff Halaburda resides in this District,

and Defendant transacts significant business in this District, including soliciting consumer

business and entering into consumer transactions.

## FACTUAL BACKGROUND

### *Michigan's Video Rental Privacy Act*

12.      In 1988, members of the United States Senate warned that records of consumers'

purchases and rentals of audiovisual and written materials offer "a window into our loves, likes,

and dislikes," and that "the trail of information generated by every transaction that is now

recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive

form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy,

respectively).

3

13.     Recognizing the need to protect its citizens' privacy rights, Michigan's legislature enacted the VRPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information. P.A. 1988, No. 378.

14.     Section 2 of the VRPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712 (emphasis added).

15.     Michigan's protection of Personal Reading Information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless.)

16.     Despite the fact that thousands of Michigan residents subscribe to BPC publications, BPC ignores its legal responsibility by systematically violating the VRPA.

### The Personal Information Market: Consumers Value Information Privacy

17.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our

Detroit_1219699_1

life . . . [and] individuals are concerned about being defined by the existing data on themselves."[1]

18.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion per year online advertising industry in the United States.[2]

19.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace, and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. *Data is currency. The larger the data set, the greater potential for analysis—and profit.*[3]

20.     It is now a nearly ubiquitous practice for companies that collect consumer information—such as names, addresses, and product purchase histories—to profit from sharing this data with numerous third parties, without ever disclosing such practices to or obtaining consent from the source consumer.

21.     In fact, an entire industry exists where companies known as data miners purchase, trade, and otherwise collect massive databases of information about consumers. Data miners then

---

[1]     The Information Marketplace: Merging and Exchanging Consumer Data (March 13, 2001), http://www.ftc.gov/bcp/workshops/infomktplace/transcript.htm (last visited Aug. 16, 2012).

[2]     *See*, Web's Hot New Commodity: Privacy, WSJ.com (Feb. 27, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Aug. 16, 2012).

[3]     Statement of FTC Commissioner Pamela Jones Harbour, http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited Aug. 16, 2012). (emphasis added).

Detroit_1219699_1

profit by selling this "extraordinarily intrusive" information in an open, and largely unregulated market.[4]

22.     The scope of data miners' knowledge of consumers is truly astounding: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

23.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[6]

24.     In their letter, the co-Chairmen recognized that:

> [t]he business of data brokerage, namely the collecting, assembling, maintaining, and selling to third-parties of consumers' personal information, has grown into a multiple billion dollar industry. *By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer.* This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[7]

---

[4]     *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, time.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Aug. 16, 2012).

[5]     Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Aug. 16, 2012).

[6]     *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Congressman Ed Markey (July 24, 2012), http://markey.house.gov/press-release/bipartisan-group-lawmakers-query-data-brokers-about-practices-involving-consumers%E2%80%99 (last visited Aug. 16, 2012).

[7]     Letter from Edward J. Markey and Joe Barton, co-Chairmen, Congressional Bi-Partisan Privacy Caucus, to Scott E. Howe, Chief Executive Officer, Acxiom (July 25, 2012) (available at

Detroit_1219699_1

25.    As consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

26.    In fact, consumers' personal information is now such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[8]

27.    These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. In fact, research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[9]

28.    Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[10] As such, where a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer is denied the full monetary value of that transaction.

---

http://markey.house.gov/sites/markey.house.gov/files/documents/Axciom%20letter.pdf) (emphasis added).

[8]    *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Aug. 16, 2012).

[9]    Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also generally* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Aug. 16, 2012).

[10]    Hann *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at 2, *available at* http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited Aug. 16, 2012) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

Detroit_1219699_1

***BPC Unlawfully Sells its Subscribers' Personal Reading Information***

29.     BPC maintains a vast digital database comprised of its subscribers' Personal Reading Information. BPC discloses the Personal Reading Information to data mining companies, who then supplement the Personal Reading Information with additional sensitive personal information about each BPC subscriber, including age, ethnicity, income, whether the subscriber has recently moved, whether the subscriber makes political contributions or charitable donations, and even the number, age, and gender of children living in the subscriber's household.

30.     BPC then sells its mailing lists—which include subscribers' Personal Reading Information, and can include the sensitive information obtained from data miners—to third parties, allowing those companies to identify which individuals purchased which magazines. (*See* Group Exhibit 1.)

31.     As a result of BPC's data compiling and sharing practices, companies can purchase mailing lists from BPC that identify BPC subscribers by their most intimate details: income, religion, donation habits, and even age, gender, and number of children. BPC's disclosure of such sensitive and personal information poses a risk of serious harm to its subscribers. For example, BPC will sell—to anyone willing to pay for it—a mailing list of all female *In Touch Weekly* subscribers with young daughters, who recently moved to Bay City.

32.     Unfortunately, BPC does not seek or obtain its subscribers' prior consent to any of these disclosures, and its subscribers remain unaware that their Personal Reading Information and other sensitive personal information is bought and sold on the open market.

33.     Consumers can sign up for BPC subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail. Regardless of how the consumer subscribes, BPC never requires the individual to read or agree to any terms of service, privacy policy, or

Detroit_1219699_1

information-sharing policy. Consequently, BPC uniformly fails to obtain any form of consent from its subscribers before disclosing their Personal Reading Information (much less notify them of such practices).

34.     As a result, BPC disclosed and continues to disclose its customers' Personal Reading Information—including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[11]—to anybody willing to pay for it.

35.     Worse yet, BPC often sells its customers' Personal Reading Information to direct marketing companies. In addition to causing waste and inconvenience, direct marketers often use information from subscriber lists to lure unsuspecting consumers into various scams,[12] including fraudulent sweepstakes, charities, and buying clubs. Thus, BPC's actions contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[13]

36.     BPC's practice of selling its customers' Personal Reading Information is particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the

---

[11]     *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited Aug. 16, 2012).

[12]     *Prize Offers: You Don't Have to Pay to Play!*, Federal Trade Commission, http://www.ftc.gov/bcp/edu/pubs/consumer/telemarketing/tel17.shtm (last visited Aug. 16, 2012).

[13]     Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007 at A1.

Detroit_1219699_1

companionship that telephone callers provide."[14] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[15]

37.    Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like BPC's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[16]

38.    By and through these actions, BPC has intentionally disclosed to third parties its Michigan subscribers' Personal Reading Information without consent, in direct violation of the VRPA and in breach of its contracts with Plaintiff Halaburda and the other members of the Class.

### FACTS RELATING TO PLAINTIFF CINDY HALABURDA

39.    Plaintiff Cindy Halaburda is a citizen of the State of Michigan.

40.    Halaburda is a current *Woman's World* subscriber.

41.    *Woman's World* is a magazine published, owned, and operated by BPC.

42.    Halaburda has never received any notice that BPC may sell or disclose her Personal Reading Information to any third parties, nor has she received instructions for opting out of Personal Reading Information disclosures.

---

[14]    *Id.*

[15]    *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* http://www.ftc.gov/os/2000/08/agingtestimony.htm (last visited Aug. 16, 2012).

[16]    *Id.*

Detroit_1219699_1

43.     Halaburda has never agreed to allow BPC to sell or disclose her Personal Reading Information to anyone.

44.     However, beginning on the date that Halaburda signed up for a subscription to *Woman's World*, and continuing to the present, BPC has disclosed, and continues to disclose, without consent or even prior notice, Halaburda's Personal Reading Information (*i.e.*, information that identifies Halaburda as a *Woman's World* subscriber) to data mining companies, who then supplement that information with data from their own files.

45.     Furthermore, during that same time period, BPC has sold—and continues to sell and offer for sale—mailing lists containing Halaburda's Personal Reading Information, without first obtaining Halaburda's written consent or even giving her prior notice of the sales.

## CLASS ACTION ALLEGATIONS

46.     **Class Definition:** Plaintiff brings this action on behalf of herself and a proposed Class, defined as follows:

> All Michigan residents who had their Personal Reading Information disclosed to third parties by BPC without consent.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendant, and (5) the legal representatives, successors, or assigns of any such excluded person.

47.     **Numerosity:** The exact number of Class members is unknown to Plaintiff at this

Detroit_1219699_1

time, but it is clear that individual joinder of each class member is impracticable. Defendant has deceived and profited from thousands of consumers who fall into the definition set forth above. Ultimately, members of the Class will be easily identified from within Defendant's records.

48.     **Typicality:** Plaintiff's claims are typical of the claims of the other Class members. Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

49.     **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class members, and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other Class members.

50.     **Commonality and Predominance:** Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting only individual members. Those questions with respect to the Class include, but are not limited to:

(a)     Whether BPC is "engaged in the business of selling at retail" books or other written materials (*i.e.*, magazines);

(b)     Whether BPC obtained consent before disclosing to third parties Halaburda's and the Class's Personal Reading Information;

(c)     Whether BPC notified Halaburda and the Class that it sells their Personal Reading Information;

Detroit_1219699_1

(d)     Whether BPC's disclosure of Halaburda's and the Class's Personal

Reading Information violated the Video Rental Privacy Act, M.C.L.

§ 445.1712;

(e)     Whether BPC's sale of Halaburda's and the Class's Personal Reading

Information constitutes a breach of contract.

51.     **Superiority:** Class proceedings are superior to all other available methods for the

fair and efficient adjudication of this controversy, as joinder of all Class members is

impracticable. The damages suffered by the individual Class members will likely be small

relative to the burden and expense of individual prosecution of the complex litigation

necessitated by Defendant's actions. Thus, it would be virtually impossible for the Class

members to obtain effective relief from Defendant's misconduct on an individual basis. Even if

Class members could sustain individual litigation, it would not be preferable to a class action,

because individual litigation would increase the delay and expense to all parties due to the

complex legal and factual controversies presented in this Complaint. By contrast, a class action

presents far fewer management difficulties and provides the benefits of single adjudication,

economy of scale, and comprehensive supervision by a single court. Economies of time, effort,

and expense will be fostered and uniformity of decisions will be ensured.

52.     **Policies Generally Applicable to the Class:** This class action is also appropriate

for certification because Defendant has acted or refused to act on grounds generally applicable to

the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure

compatible standards of conduct toward the Class members, and making final injunctive relief

appropriate with respect to the Class as a whole. Defendant's practices challenged herein apply

to and affect the Class members uniformly, and Plaintiff's challenge of those practices hinges on

13

Detroit_1219699_1

Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

53.     Plaintiff reserves the right to revise the definition of the Class as necessary based upon information learned in discovery.

## FIRST CAUSE OF ACTION
### Violation of the Video Rental Privacy Act
### (M.C.L. § 445.1712)
### (On Behalf of Plaintiff and the Class)

54.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

55.     As a magazine publisher, BPC is engaged in the business of selling written materials. M.C.L. § 445.1712.

56.     By subscribing to *Woman's World*, Halaburda purchased written materials from BPC. M.C.L. § 445.1712.

57.     Because Halaburda purchased written materials from BPC, Halaburda is a "customer" within the meaning of the VRPA. M.C.L. § 445.1711(a).

58.     At all times relevant, and beginning on the date Halaburda initiated her *Woman's World* subscription, BPC disclosed—and continues to disclose—Halaburda's Personal Reading Information, which identifies her as a *Woman's World* subscriber, in two ways.

59.     First, BPC discloses mailing lists containing Halaburda's Personal Reading Information to data mining companies, who then supplement the mailing lists with additional information from their own databases, before sending the mailing lists back to BPC.

60.     Second, BPC sells its mailing lists containing Halaburda's Personal Reading Information—enhanced with the additional information from data miners—to interested third parties, who then use the mailing lists to contact BPC subscribers. Because the mailing lists include the additional information from the data miners, the lists are more valuable, and BPC is

Detroit_1219699_1

able to increase the profits gained from mailing list sales.

61.     By selling and otherwise disclosing its subscriber lists, BPC disclosed to persons other than Halaburda records or information concerning Halaburda's purchase of written materials from BPC. M.C.L. § 445.1712.

62.     The information disclosed by BPC indicates Halaburda's name and address, as well as the fact that Halaburda subscribes to *Woman's World*. Accordingly, the records or information disclosed by BPC indicate Halaburda's identity. M.C.L. § 445.1712.

63.     BPC did not give Halaburda prior notice that it would disclose to third parties her Personal Reading Information, nor did it give her instructions for opting out of having her Personal Reading Information disclosed.

64.     In fact, BPC never provided Halaburda with any information of any kind (either written or oral) that relates in any way to the sale and disclosure of her Personal Reading Information.

65.     At no time did Halaburda ever consent to allow BPC to disclose her Personal Reading Information to anyone.

66.     By disclosing Halaburda's Personal Reading Information, BPC violated Halaburda's common law right to privacy.

67.     By disclosing Halaburda's Personal Reading Information, BPC violated Halaburda's statutorily-protected right to privacy in her reading habits. M.C.L. § 445.1712.

68.     Additionally, because Halaburda and the Class paid for their BPC subscriptions, and BPC was obligated to comply with the VRPA, BPC's unlawful disclosure of Halaburda's and the other Class members' Personal Reading Information deprived them of the full value of their paid-for subscriptions. Because Halaburda and the other Class members ascribe monetary

value to the privacy of their Personal Reading Information, BPC's unlawful sale of their Personal Reading Information deprived them of paid-for value, thereby causing them economic damages.

69.     Also, because Halaburda and the other Class members priced VRPA compliance into their willingness to subscribe to BPC publications, they overpaid for their BPC subscriptions.

70.     Further, Halaburda's and the other Class members' Personal Reading Information has monetary value, and BPC's failure to comply with the VRPA deprived Halaburda and the Class of their statutorily-guaranteed right to control the disclosure and use of that data. As such, BPC has diluted the value of Halaburda's and the other Class members' personal property, and deprived them of the opportunity to sell their personal property at market rates for their own financial gain. Accordingly, Halaburda and the other Class members have sustained, and continue to sustain, monetary injuries as a direct and proximate result of BPC's violation of the VRPA.

71.     As a result of BPC's unlawful and continued disclosure of their Personal Reading Information, Plaintiff Halaburda and the other Class members have suffered privacy and economic injuries. On behalf of herself and the Class, Plaintiff Halaburda seeks: (1) an injunction requiring Defendant BPC to obtain consent from Michigan subscribers prior to the disclosure of their Personal Reading Information as required by the VRPA; (2) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to M.C.L. § 445.1715(a); and (3) costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

Detroit_1219699_1

## SECOND CAUSE OF ACTION
### Breach of Contract
### (On Behalf of Plaintiff and the Class)

72.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

73.     BPC offered to sell magazine subscriptions to Halaburda and the other Class members for specific prices.

74.     Halaburda and the other Class members accepted BPC's offers by agreeing to pay the offered prices as consideration for purchasing the magazine subscriptions.

75.     Accordingly, BPC on the one hand, and Halaburda and the other Class members on the other, entered into binding contracts for magazine subscriptions.

76.     Because the laws existing at the time and place of the making of a contract are incorporated into it, the contracts between BPC and Halaburda and the other Class members included obligations for the parties to abide by all applicable laws, including the VRPA.

77.     Halaburda and the other Class members performed their obligations under the contracts by paying the consideration owed to BPC for the purchase of the magazine subscriptions, and by complying with all applicable laws.

78.     The ability to control disclosure of sensitive personal information—such as Personal Reading Information—is material to any consumer transaction because it is likely to affect a consumer's decision to, or conduct regarding, purchase of a product or service.

79.     BPC's failure to perform its contractual obligations imposed by the VRPA—*i.e.*, maintaining confidentiality of subscribers' Personal Reading Information—constitutes a material breach by BPC of the contracts with Halaburda and the other Class members.

80.     Plaintiff Halaburda and the other Class members have suffered actual damages as a result of BPC's breach in the form of the value Halaburda and the other Class members ascribe

Detroit_1219699_1

to and pay for the confidentiality of their Personal Reading Information. This amount is tangible and will be calculated at trial.

81.     Further, a portion of the purchase price of each BPC magazine subscription sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Halaburda's and the other Class members' Personal Reading Information, as required by the VRPA. Because Halaburda and the other Class members were denied services that they paid for and were entitled to receive—*i.e.*, confidentiality of their Personal Reading Information—they incurred actual monetary damages.

82.     Additionally, because BPC profited from its breach, Halaburda and the other Class members are entitled to disgorgement of all profits obtained by BPC from its unlawful disclosure of its subscribers' Personal Reading Information.

83.     Accordingly, Plaintiff Halaburda and the other Class members seek an order declaring that BPC's conduct constitutes a breach of contract, and awarding Plaintiff and the Class disgorgement of BPC's unlawfully obtained profits and damages in an amount to be calculated at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Cindy Halaburda, on behalf of herself and the Class, prays that the Court enter judgment in her favor and against BPC and for the following relief:

(1)     Certify the Class as defined above, appoint Plaintiff as Class Representative, and designate her counsel as Class Counsel;

(2)     Declare that BPC's conduct as described herein violates the Video Rental Privacy Act, M.C.L. § 445.1712;

(3)     Declare that BPC's conduct as described herein constitutes a breach of contract;

(4)     Award actual damages, including disgorgement, or $5,000, whichever is

Detroit_1219699_1

greater, to each class member, as provided by the Video Rental Privacy Act, M.C.L. § 445.1715(a);

(5)     Award injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring BPC to cease the unlawful disclosures discussed herein;

(6)     Award of reasonable attorneys' fees, interest and costs, M.C.L. § 445.1715(b); and

(7)     Such other and further relief as the Court deems equitable and just.

## DEMAND FOR TRIAL BY JURY

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: August 23, 2012

Respectfully submitted,

**Cindy Halaburda**, individually and on behalf of all others similarly situated

By: /s/  Christine E. Ficks
One of her attorneys

Christine E. Ficks
BODMAN PLC
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226
Tel: (313) 393-7561
cficks@bodmanlaw.com

Jay Edelson*
Rafey S. Balabanian
Ari J. Scharg
EDELSON MCGUIRE, LLC
350 N. LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378
jedelson@edelson.com
rbalabanian@edelson.com
ascharg@edelson.com

Detroit_1219699_1

*Admission pending

*Counsel for Plaintiff Cindy Halaburda*

Detroit_1219699_1

## CERTIFICATE OF SERVICE

 I, Christine E. Ficks, an attorney, certify that on August 23, 2012, I served the above and foregoing *Amended Class Action Complaint and Demand for Jury Trial*, by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system, on this the 23rd day of August 2012.


       /s/ Christine E. Ficks_____

Detroit_1219699_1